Highsmith v Woodhull Med. Ctr. (2024 NY Slip Op 50646(U))

[*1]

Highsmith v Woodhull Med. Ctr.

2024 NY Slip Op 50646(U)

Decided on May 31, 2024

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 31, 2024
Supreme Court, Kings County

Robert Highsmith, Plaintiff,

against
Woodhull Medical Center and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Defendants.

Index No. 504742/2021

Plaintiff
Jonathan Joseph Panarella, Esq. (jpanarella&commat;kglawteam.com)
Krentsel & Guzman, LLP
17 Battery Place, Suite 604
New York, NY 10004
212-227-2900
Defendants
Joshua Cohen, Esq. (j.cohen&commat;bpn.law)
Barker Patterson Nichols, LLP
300 Garden City Plaza, Suite 100
Garden City, NY 11530
516-282-3355

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF #s: 37-78
Defendants Woodhull Medical Center ("Woodhull") and New York City Health and Hospitals Corporation move (Seq. No. 1) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing the Plaintiff's complaint on the ground that Defendants are immune from liability under New York's Emergency or Disaster Treatment Protection Act ("EDTPA"), on the ground that Defendants are immune from suit and liability under the federal Public Readiness and Emergency Preparedness Act ("PREP Act"), and/or on the ground that there are no triable issues of fact as to the alleged departures from the standard of care or proximate causation. Plaintiff opposes the motion on all grounds for the relief sought.
Plaintiff commenced this action on February 26, 2021, alleging medical malpractice in connection to the prevention and treatment of pressure ulcers during Plaintiff's hospitalization at Woodhull from May 21, 2020 to June 26, 2020.
On May 21, 2020, Plaintiff presented to the emergency department of Woodhull with confusion, tachycardia, and acute kidney failure. Plaintiff was 38 years old, weighed approximately 440 pounds, and was in a hyperosmolar hyperglycemic state with blood glucose over 1,700. On the second day of his admission, he was transferred to the ICU, intubated, and placed on a ventilator due to poor oxygenation. He developed a right radial artery thrombus within two hours of an arterial line being placed, indicating he was hypercoagulable. He initially tested negative for COVID-19 but tested positive on May 28 while still in the ICU.
During Plaintiff's hospitalization, he developed a sacral pressure ulcer first documented on May 29. Plaintiff was stable enough to be extubated and removed from the ventilator on June 1, but remained on a nasogastric feeding tube and Foley catheter to remove urine. On June 8, he was moved from ICU to the regular medicine floor but remained hospitalized and bedbound. Plaintiff was subsequently treated for sepsis secondary to sacral ulcer infection and underwent surgical debridement on June 19. He was ultimately discharged to Linden Center for Nursing and Rehabilitation on June 26. At the time of his discharge, the sacral pressure ulcer was recorded to be at stage IV. Plaintiff alleges that Woodhull, through its employees and agents, departed from the standard of care in preventing and treating pressure ulcers, and these departures proximately caused the development and deterioration of his pressure ulcer.
The EDTPA (Public Health Law former art. 30-D, §§ 3080-3082) was enacted and signed into law at the height of New York's inundation and response to the COVID-19 pandemic in April 2020, and in the context of a host of executive orders declaring a statewide public health emergency. Recognizing the treatment of patients with COVID-19 as a "matter of vital state concern," the act afforded broad liability protections to health care facilities and professionals "from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency." The act was effective retroactively to March 7, 2020.
Under former Public Health Law § 3082 (1) (emphasis added),
"1. Notwithstanding any law to the contrary, except as provided in subdivision two of this section, any health care facility or health care professional shall have immunity from any liability, civil or criminal, for any harm or damages alleged to have been sustained as a result of an act or omission in the course of arranging for or providing health care services, if:
(a) the health care facility or health care professional is arranging for or providing health care services pursuant to a COVID-19 emergency rule or otherwise in accordance with applicable law;
(b) the act or omission occurs in the course of arranging for or providing health care services and the treatment of the individual is impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives; and
(c) the health care facility or health care professional is arranging for or providing health care services in good faith."
Subdivision (2) of the statute provided an exception wherein facilities and providers could be held liable for "willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm . . . provided, however, that acts, omissions, or decisions resulting from a resource or staffing shortage shall not be considered to be willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm."
At the time of enactment, Public Health Law § 3081 (5) defined "health care services" broadly to include "the care of any individual who presents at a health care facility or to a health care professional during the period of the COVID-19 emergency declaration," regardless of whether that individual was being treated for COVID-19. The EDTPA was later amended to narrow the scope of that definition to COVID-19-specific health care services, removing the "any individual" subclause, but this amendment took effect non-retroactively on August 3, 2020. The pre-amendment version of the act is therefore applicable to Plaintiff's May-June 2020 treatment at Woodhull (see L 2020, ch 134; Ruth v Elderwood at Amherst, 209 AD3d 1281 [4th Dept 2022]).
The EDTPA was repealed on April 6, 2021, with no express language on whether the repeal was retroactive.
In support of their motion for summary judgment, Defendants submit an affirmation from Ashvin Butala, M.D. ("Dr. Butala"), an attending physician who treated Plaintiff at Woodhull, and an affirmation from Ramon Villa-Real ("Villa-Real"), the Deputy Chief Nursing Officer during Plaintiff's admission to Woodhull. Defendants also submit the deposition transcript of Patricia Mazone ("RN Mazone"), a wound care nurse who treated Plaintiff at Woodhull, as well as other deposition transcripts, medical records, and relevant case law.
Dr. Butala affirms that upon Plaintiff's admission on May 21, 2020, he was suspected to have a COVID-19 infection due to his symptoms, including fever, hypercoagulability, and insulin-resistant acute kidney injury. Although he initially tested negative, a repeat test was ordered on May 28 which came back positive. Dr. Butala opines that it is highly likely his condition and septic shock stemmed from COVID-19. Dr. Butala states that Plaintiff was placed in a single patient bay in the ICU, and staff and nurses had to don and remove "extensive personal protective equipment" (PPE) each time they treated him. Dr. Butala states that after Plaintiff was extubated on June 1, he still "remained in isolation with droplet precautions for COVID-19 to mitigate transmission," i.e., still requiring all personnel to wear PPE. After Plaintiff was moved from the ICU to the general medicine floor, where he remained from June 8, 2020 to June 26, 2020, Dr. Butala affirms that the hospital's inundation with COVID-19 patients, precautions, and shortages continued to impact his care.
Dr. Butala states that COVID-19 placed "exponential demands" on the physicians and staff due to the high number of patients, staffing shortages, and the addition of time-consuming PPE protocols. Three new ICU units were opened, increasing the number of ICU beds from 12 to [*2]50. Staff from other areas of the hospital were reassigned to assist in the ICU as the patient-to-staff ratio also increased. Further, the required PPE items "were in short supply" during that time, as these and others supplies "were in high demand and exhausted at a higher rate than before the pandemic." To treat patients in COVID-19 isolation, staff had to wear "two masks (one N95 and one surgical mask), eye goggles or face shield, isolation gowns and gloves," and those items were removed and "placed in special containers" when they left the room. According to Dr. Butala, Plaintiff's large body size presented additional challenges in light of these COVID-19 circumstances, because more personnel were required to safely turn and reposition him.
Deputy Chief Nursing Officer Villa-Real also paints a stark picture of the hospital's challenges from March 2020 through Plaintiff's admission in May-June 2020. Villa-Real states that Woodhull "had a dramatic influx of COVID patients that was overwhelming," and the hospital was "short on staff and space" as the ICU ratio of patients to nurses went from 2-1 to 4-1 or 5-1. To make matters worse, there were staffing shortages due to physicians, nurses, and other employees becoming ill with COVID-19 themselves or isolating because of exposure. Woodhull nurses were reassigned from other units to cover COVID-19 patients in the ICU, and the staff was also supplemented with "agency nurses from outside Woodhull" and "members of the military" assisting in patient care. Villa-Real also affirms that turning, repositioning, cleaning, and dressing changes on Plaintiff required a team of four to five persons wearing PPE due to his weight, and Plaintiff's care was thus impacted by the strain on personnel, supplies, and "the substantial increase in acutely ill patients during this time period."
Additionally, RN Mazone testified that to her knowledge there was an order in place to turn Plaintiff every two hours, and he was "being turned frequently" according to nursing flowsheets. However, she also testified that there were "sometimes supplies and sometimes staffing issues" which presented delays and additional difficulties to the turning/positioning protocols during the COVID-19 emergency. Specifically, she testified on shortages in staff and equipment (positional wedges) and outside support staff who were unfamiliar with the location of supplies. She also testified that at times Plaintiff and other patients with COVID-19 could not be turned due to oxygen desaturation.
As an initial matter, Plaintiff argues in opposition that the repeal of the EDTPA applies retroactively, as a "remedial" measure which permits formerly barred claims for damages that arose during the COVID-19 emergency. Plaintiff submits legislative memoranda, floor debate transcripts, and an affidavit from the bill's sponsor, Assemblyman Ronald T. Kim, to argue the legislature's intent was for the repeal to be interpreted this way. Indeed, the issue of whether the repeal is retroactive or prospective has been litigated extensively since the EDTPA was repealed. If applied prospectively, the act's protections remain in effect for claims that arose from March 7, 2020 until April 6, 2021, but it ceases to apply to claims related to the ongoing COVID-19 impact after that date. If applied retroactively, the EDTPA loses effect entirely, allowing new actions to be brought against health care providers previously shielded by the act.
Three of the four Appellate Divisions are now in agreement that the EDTPA repeal was prospective, not retroactive, and it remains in force for applicable claims that arose from March 7, 2020 through April 6, 2021 (Hasan v Terrace Acquisitions II, LLC, 224 AD3d 475 [1st Dept 2024]; Whitehead v Pine Haven Operating LLC, 222 AD3d 104 [3d Dept 2023]; Ruth v Elderwood at Amherst, 209 AD3d 1281 [4th Dept 2022]). This Court also notes that the Second Department, while not addressing the repeal directly, has also continued to uphold EDPTA immunity for post-repeal cases involving events that occurred while the act was in effect (see [*3]Martinez v NYC Health and Hospitals, 223 AD3d 731 [2d Dept 2024]; Mera v New York City Health and Hosps. Corp., 220 AD3d 668 [2d Dept 2023]). It goes without saying that this Court is bound to follow these holdings and not the earlier, trial court level decisions cited by Plaintiff.
Where the appellate courts have directly addressed this issue, their reasoning is precise and thorough. The EDPTA repeal is legislation of a kind that "would impact substantive rights" if applied retroactively by imposing new civil or criminal liability on parties who were previously immune, and therefore a "clear expression of the legislative purpose . . . to justify a retroactive application" is required to defeat the presumption of prospective application (Hasan, quoting Matter of Regina Metro. Co., LLC v New York State Div. of Hous. & Community Renewal, 35 NY3d 332 [2020]). "The expression of intent must be sufficient to show that the legislature contemplated the retroactive impact on substantive rights and intended that extraordinary result" (id.) The appellate courts have found no such expression of legislative purpose or intent. In fact, both the First Department in Hasan and the Fourth Department in Ruth specifically considered the affidavit of Assemblyman Kim as irrelevant and unpersuasive, holding "post-enactment statements or testimony by an individual legislator, even a sponsor, is generally irrelevant" (Ruth, quoting Civil Serv. Empls. Assn. v County of Oneida, 78 AD2d 1004, 1005 [4th Dept 1980], lv denied 53 NY2d 603 [1981]).
Furthermore, even a cursory look at the floor debate transcript demonstrates there was no such consensus or "clear expression of purpose" when the repeal was voted into law. Assemblyman Kim made a single statement expressing his belief and opinion the repeal should be applied retroactively, but also stated multiple times — in response to direct questions expressing concern about the retroactive impact — that the bill's purpose was to "reinstate the status quo" for claims going forward, and to "go back to normal liability standards" now that hospitals were "no longer in triage." He further stated that it "ultimately will be up to the courts to decide" how it would apply to earlier claims, relating to the time when hospitals were in triage. Many other voters in the assembly "indicated an intent, expectation, or hope that the repeal would be applied prospectively" (Whitehead, at 108), including members of the Health Committee who spoke plainly about their concerns that it would otherwise expose health care workers to civil liability for providing "emergency and essential medical services" during the heaviest days of the pandemic.
In fact, there is a clear sense in the record that the lawmakers contemplated the retroactive impact and did not intend that result. Assembly voters repeatedly acknowledged their intent to hold bad actors accountable without punishing those who were dealing with "changing and confusing orders, lack of appropriate equipment [and] staffing changes" in a time of crisis that has since passed. One supporter of the bill stated "I think there's very, very serious constitutional due process issues if you try to impose retroactive liability. And I'm confident that the courts will apply this prospectively, as they should." Another added that when the issue was discussed in the Health Committee, "The [question] was very clear, is this bill retroactive. The answer was very clear: No, it is not" (see NYSCEF Doc No. 67). Considering these and other comments from the floor debate, it is disingenuous to state that the assembly voted 49-1 on the bill "with the full knowledge of the retroactive intent," as argued by Plaintiff. Meanwhile, as pointed out in Hasan, "the Senate debate included only one statement [on the issue] expressing the understanding that the repeal would be prospective" (Hasan, at 478).
It is a basic principle of stare decisis that in the absence of contrary authority from the Second Department or Court Appeals, this Court is obligated to follow the precedent set by [*4]another appellate division on this issue (Mountain View Coach Lines, Inc. v Storms, 102 AD2d 663, 664 [2d Dept 1984]). As Assemblyman Kim stated repeatedly before the vote, any ambiguity on the bill's retroactive impact would be decided by the courts. The precedent set for this Court is clear that the EDTPA repeal was prospective, not retroactive, and the act still provides immunity to the individual health care providers, nursing homes, and hospitals who would have received it for events that occurred while the act was in effect.
Having determined that the EDTPA's repeal does not prevent it from being applied here, the next question is whether the treatment and care at issue is covered under the act. In a motion for summary judgment on the basis of the EDTPA, it is essentially the defendants' burden to establish prima facie that the defendant was a health care facility or professional acting in good faith, that the alleged acts or omissions occurred in the course of providing health care services during the COVID-19 emergency period, and that "the treatment of the individual is impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives" (Pub Health Law §§ 3081; 3082 [1] [emphasis added]). As noted by other trial courts, the statute does not qualify whether the effect is positive, negative, or neutral — "it merely requires that treatment be 'impacted'" (see Alexander v Grand South Point, LLC, 82 Misc 3d 1203[A] [Sup Ct, Nassau County 2024]; Crampton v Garnet Health, 73 Misc 3d 543 [Sup Ct, Orange County 2021]). The Third Department held that the "impact" of COVID-19 included visitation and dining service restriction, screening, and testing (see Whitehead, at 110).
Based on Defendants' submissions, all prongs of the EDTPA apply to the case herein. First, it is undisputed that Woodhull is a health care facility (hospital) that was authorized to provide health care services pursuant to the Public Health Law and did so in good faith.
Second, the alleged acts and omissions, all stemming from pressure ulcer prevention and treatment during Plaintiff's hospitalization from May-June 2020, occurred "in the course of providing health care services." As previously discussed, the earliest enacted version of Public Health Law § 3081 (5), effective from March 7, 2020 through August 2, 2020, defined health care services very broadly to include "the care of any individual who presents at a health care facility or to a health care professional during the period of the COVID-19 emergency declaration." Regardless of whether Plaintiff himself was diagnosed or treated for COVID-19 (which he was after testing positive on May 28), all his care at Woodhull occurred during the COVID-19 emergency declaration period, and therefore falls within the definition of health care services pursuant to former Public Health Law § 3081 (5) (c).
Finally, the affirmations of Dr. Butala and Deputy Chief Nursing Officer Villa-Real, as well as the testimony of RN Mazone, establish that Plaintiff's treatment throughout his May-June 2020 admission was impacted by the novel coronavirus outbreak and Woodhull's response to said outbreak. At that time, New York was still in the first wave of the pandemic, non-essential businesses were still largely under lockdown, and no vaccine was available. In the spring of 2020, Woodhull's number of ICU patients and patient-to-staff ratio were multiplied beyond normal conditions, regular medicine units were converted to ICUs, staff members were reassigned to the most vulnerable patients, and even outside nurses and the U.S. military were brought in to cover staffing shortages. Those shortages were caused by a combination of a large influx of critically ill patients and the mandate for physicians and nurses to isolate themselves due to their own illness or exposure, in support of the state's directives. Thus, while Defendants do not concede that this led to any negligent acts or omissions, they do demonstrate that the [*5]heavier load of patients, staffing and equipment shortages, and constantly changing environment of the COVID-19 emergency impacted Plaintiff's treatment, including inter alia carrying out standard turning/repositioning protocols both within the ICU and the general medicine unit. Their affirmations and testimony are in line with the dire circumstances that hospitals and nursing facilities were encountering during the first wave of the COVID-19 pandemic and the reason the EDTPA was enacted.
Plaintiff himself was among the influx of COVID-19 patients, in addition to his other comorbidities and complications. He spent the first two weeks of his admission in the ICU, the first 10 days intubated on a ventilator. During that time, he was repeatedly tested for COVID-19 but not confirmed positive until May 28. Regardless of when he tested positive, the hospital's COVID-19 policies and protocols required isolation in a single-patient bay and extensive use of PPE when any staff interacted with him, in accordance with the best information and guidelines available at the time. When Plaintiff was eventually extubated and transferred out of the ICU, he was still COVID-19 positive, which mandated isolation and PPE protocols through June 17 according to hospital records. As the hospital employees testified or stated in their affirmations, the donning and removing of PPE alone presented COVID-19-specific challenges in securing the necessary staff and supplies, particularly for a patient like Plaintiff who could require four to five personnel at a time to be turned. Plaintiff did not test negative until June 19, approximately a week before his discharge. The fact he had a suspected and later confirmed case of COVID-19 had an obvious and direct impact on the treatment and care he received at Woodhull during the height of the pandemic, in comparison to a patient being treated at any other time in the hospital's history.
To the extent that former Public Health Law § 3082 (2) contains a general exception for gross negligence, willful or intentional criminal misconduct, reckless misconduct, and intentional infliction of harm, Plaintiff does not allege the above in his complaint, nor make any evidentiary showing in opposition to this motion. Plaintiff in fact states in an attorney affirmation that this action "sounds in common law negligence" and ordinary departures from the standard of care. As such, the subdivision (2) exception does not apply.
The EDTPA, as effective throughout any alleged acts and omissions from May-June 2020, provided broad immunity to health care providers for alleged harm which occurred during the COVID-19 emergency declaration and was impacted by that emergency. Such is the case in Plaintiff's treatment here. Accordingly, Defendants have established prima facie entitlement to summary judgment and dismissal of Plaintiff's claims against them based on the EDTPA.
In opposition, Plaintiff fails to raise any issues of fact relevant to the EDTPA. The facts involving the timeline of Plaintiff's treatment and the impact of COVID-19 are undisputed. Plaintiff merely argues for an alternative and more narrow reading of the statute which is not supported by any clear or binding authority. Plaintiff argues that the actual allegations of negligence — in this case related to pressure ulcer prevention and treatment — must have a direct link to specific COVID-19 policies or restrictions, and the statute simply cannot confer immunity to health care providers because they were "too busy intubating people" and "too busy saving lives" to follow the normal course of treatment and care. Yet this is exactly the broad immunity provided by the EDPTA, in the plain language of the statute and as interpreted by courts throughout the state, in response to the extraordinary circumstances faced by health care providers in New York state during the peak of COVID-19 infections and hospitalizations. Even the statute's exception for gross negligence explicitly carves out a defense of staffing shortages.
The trial court decisions cited by Plaintiff were denied on the basis that the defendants made an insufficient or no showing of the COVID-19 impact, failing to meet their prima facie burden. While those decisions are not binding, they are also easily distinguished from this case. Here, Defendants have submitted competent affirmations to support their argument that Plaintiff was impacted directly by COVID-19 policies and responses, as an ICU patient with COVID-19 and as a patient requiring extra staff and resources at a time when the hospital was stretched thin. Where this Court's judicial colleagues have dealt with cases directly related to pressure ulcers, application of the EDPTA was only denied because the plaintiff's allegations of harm fell outside the COVID-19 emergency window, such as where a plaintiff's nursing home admission began in July 2019 through September 2020, and her "post-pandemic care was a continuance of the pre-pandemic care" (Quattlebaum v Dragomir, 80 Misc 3d 1203[A] [Sup Ct, Nassau County 2023]). That is not the case here, where Plaintiff's admission to Woodhull fell squarely within the COVID-19 emergency declaration and the applicable period of the EDPTA. The pandemic was not merely a blip in a longer treatment period but impacted his entire stay at Woodhull.
Plaintiff's interpretation that the EDTPA still requires a showing of compliance with the standard of care would negate the very purpose of the law, which conferred total immunity from civil liability for ordinary negligence, cutting off such claims before any discussion of the standard of care is reached. As such, this Court need not address the expert affirmations submitted by Defendants and Plaintiff arguing the substance of Plaintiff's medical malpractice claims.
Finally, as to Defendants' argument on the grounds that the federal PREP Act (42 USCA § 247d-6d) also entitles them to summary judgment or dismissal on the basis of subject matter jurisdiction, that branch of the motion is denied as misplaced. "State courts addressing immunity defenses under the PREP Act are required to answer only whether the plaintiff's claims fall within the PREP Act's immunity provision. . . If the answer is no . . . there is no federal law left to apply and the case can proceed under state law" (Kluska v Montefiore St. Luke's Cornwall, 2024 NY Slip Op 02311 [2d Dept 2024], citing Solomon v St. Joseph Hosp., 62 F4th 54 [2d Cir 2023]).
The PREP Act is a federal law enacted in 2005 which provides immunity from suit and liability under federal and state law for claims "caused by, arising out of, relating to, or resulting from" the manufacture or administration of a "covered countermeasure" as defined by the federal government in response to a declared emergency. As it applies to the coronavirus outbreak, the federal government declared such emergency and defined the covered countermeasures as an "antiviral, drug, biologic, diagnostic, device, or vaccine" utilized to diagnose, treat, or mitigate COVID-19 (see Kluska, at 2).
Generally, the PREP Act has been applied much more narrowly than state laws like the EDTPA. In a Connecticut case dealing with the issue, it was emphasized that "[i]n determining whether PREP Act immunity applies in a given case, courts focus on the claims of the plaintiff, as pleaded in the complaint" (Mills v Hartford Healthcare Corporation, 347 Conn. 524 [2023] [emphasis added]). The court must ask whether the countermeasure is an inherent part of the plaintiff's claim, asserting a theory of liability related to improper use of a drug, device, or vaccine. In a recent decision, on point for the same facts of this case, the Second Department held that while a ventilator may be considered a COVID-19 countermeasure, the plaintiff's allegations of negligence in pressure ulcer prevention did not necessarily arise from the use of a ventilator as covered by the PREP Act (Kluska, at 2).
Here, as in Kluska, Defendants have not made an undisputed showing that Plaintiff's claim is grounded in the improper use of a ventilator, antibiotics, or any other COVID-19 countermeasure. Plaintiff alleges medical malpractice in pressure ulcer prevention and treatment, not only while Plaintiff was on a ventilator but also after he was removed from the ventilator. Plaintiff does not allege that his injuries were caused by the use or misuse of a ventilator, but rather by alleged departures from the standard of care, e.g., turning and positioning, providing proper nutrition and hydration, and wound care. Under the much narrower scope of the federal law, the PREP Act does not apply to Plaintiff's claims, nor does it deprive this Court of subject matter jurisdiction. However, this case is ultimately rooted in state law, and under the blanket immunity provided by the EDTPA, Plaintiff's claims are dismissed.
Accordingly, it is hereby:
ORDERED that Defendants' motion (Seq. No. 1) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing the Plaintiff's complaint on the ground that Defendants are immune from liability under the EDTPA, on the ground that Defendants are immune from suit and liability under the federal PREP Act, and/or on the merits of Plaintiff's claims, is GRANTED TO THE EXTENT that Plaintiff's complaint is barred by the EDPTA immunity provision, and this action is DISMISSED in its entirety.
The Clerk shall enter judgment in favor of WOODHULL MEDICAL CENTER and NEW YORK CITY HEALTH AND HOSPITALS CORPORATION.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez
J.S.C.